RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
ALEXANDRIA, LOUISIANA
DATE 3/24/11
BY [illegible]

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**ALEXANDRIA DIVISION**

| | |
|---|---|
| **BOB B. BALLARD** | **CIVIL ACTION NO. 1:09-cv-1557** |
| **-vs-** | **JUDGE DRELL** |
| **XTO ENERGY, INC., ET AL** | **MAGISTRATE JUDGE KIRK** |

# RULING

Before the Court is the motion for summary judgment of Defendants XTO Energy, Inc. ("XTO") and T.S. Dudley Land Company, Inc ("T.S. Dudley") (collectively "Defendants") (Doc. 31). Plaintiff Bob B. Ballard ("Plaintiff") makes claims against Defendants based on breach of contract, promissory estoppel, and fraud. For the written reasons given below, we GRANT Defendants' motion and ORDER that Plaintiff's claims be DISMISSED, with prejudice.

## BACKGROUND

Plaintiff owns approximately 15 acres of land in Natchitoches Parish, Louisiana, where a boom in mineral exploration and land leasing occurred in 2008. Plaintiff received various offers to lease his land. He rejected these offers and instead joined a "pool" of landowners seeking to lease their mineral rights. In July of 2008, the pool entered into negotiations with Brent Broussard ("Defendant's representative" or "Broussard"), a lease broker representative of T.S. Dudley who was acting on behalf of XTO.

Following an apparent oral discussion between various members of the pool and Broussard, Broussard exchanged emails with Stephen Durr ("Durr"), a representative of the pool. These emails constitute the alleged offer and acceptance at the core of the present dispute, so we quote them here

at length. First, on July 29, 2008, Durr wrote Broussard the following:

> Dear Mr. Broussard,
>
> Thank you for speaking with me this morning about your interest in leasing on behalf of XTO the property owned by the landowners on the list provided last week by Bob Ballard to Leonard McCarty of XTO. . . .
>
> I know that in addition to myself, you have spoken to other members in our group . . . All property owners participated in a conference call last night and a second one earlier this evening to discuss your proposal.
>
> We have collectively agreed to accept your proposal; however, because several of us had conversations with you, we would like to confirm our understanding of the transaction. Could you confirm via email the following terms?
>
> - $13,000 per acre up-front signing bonus for the primary term of three (3) years
>
> - 25% royalty percentage, without deduction for costs whether incurred from third parties or from XTO (in other words, the royalty would be based upon the gas prices at the well head)
>
> - $13,000 per acre up-front bonus for the two (2) year option should XTO exercise such option
>
> - Acceptability of the special provisions in our Exhibit A, a copy of which is attached along with the Lease Form we prefer to use
>
> If these are the terms you have proposed, please confirm same at your earliest opportunity via email to all of the parties above. (The distribution list for this message includes the e-mail address for everyone in our group who has an e-mail account) . . .
>
> If these terms are acceptable, we as a group accept your offer and would like to proceed immediately with finalizing a Commitment Letter, to be immediately followed by finalizing lease documents.
>
> We look forward to hearing from you. Thanks again.

(Doc. 31-3, pp. 2-3). Second, Broussard responded with the following, which Plaintiff alleges to be an offer:

> Stephen,
>
> This e-mail is to confirm XTO's offer of $13,000/ac for a 3 yr lease with a 2yr option at $13,000/acre with a 25% royalty pending the approval of your lease addendum.
>
> Thanks,
> Brent

(Doc. 31-3, p. 2). Third, Durr replied to Broussard with what Plaintiff alleges to be an acceptance:

> Thanks so much for responding quickly. We are all pleased to be moving forward with XTO.
>
> I know you are traveling but it would be great if you could send your form commitment letter. We would be happy to fill in the blanks for you. That way, once the addendum is approved byXTO, and we get any last minute questions answered, we can sign and return to you for XTO's counter signature.
>
> Thanks again.

*Id.* Thereafter, the negotiations took a turn for the worse. Broussard replied to Durr's hopeful email with the following:

> Stephen,
>
> I was informed this morning that I have to get upper management's authority for any leases/packages that exceed 3 million dollars. As soon as I get the authority to proceed I will contact you again.

(Doc. 31-3, p. 1). Finally, the negotiations terminated when Leonard McCarty, a landman with XTO, emailed Broussard and the pool with the following news:

> As stated in Brent Broussard's email of August 1, 2008, XTO's upper management has reserved approval on lease packages greater than three million dollars. I have been informed that our upper management did not approve this package.

*Id.*

Plaintiff argues that Broussard only informed the pool of XTO's reservation of upper management approval for leases greater than 3 million dollars after Broussard's offer on XTO's

behalf had been accepted. XTO, he claims, thus attempted to rescind only after the parties had a deal. He filed the present action for his share of the deal, asserting claims on theories of contract, promissory estoppel, and fraud.

## ANALYSIS

Under Rule 56, the Court will grant a party's motion for summary judgment only if:

> the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law . . . support[ing] the assertion by citing to particular parts of materials in the record.

Fed. R. Civ. P. 56. "'Material facts' are those facts 'that might affect the outcome of the suit under the governing law.'" *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 [1986]). The facts are reviewed with all "justifiable inferences" drawn in favor of the party opposing the motion. See *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255). However, factual controversies are resolved in favor of the non-movant "only when there is an actual controversy–that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996).

Once the movant shows that there are no genuine issues of material fact, the burden is on the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact warranting a trial. *Texas Manufactured Housing Ass'n v. Nederland*, 101 F.3d 1095, 1099 (5th Cir. 1996), cert. denied, 521 U.S. 1112 (1997). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for

summary judgment. *Brock v. Chevron U.S.A., Inc.*, 976 F.2d 969, 970 (5th Cir. 1992). Likewise, the nonmovant's burden cannot be satisfied by unsubstantiated assertions or metaphysical doubt as to the facts. E.g., *Doe v. Dallas Independent School Dist.*, 153 F.3d 211, 215 (5th Cir.1998).

**I. A CONTRACT WAS NOT CREATED BETWEEN THE PARTIES**

In their briefs, Defendants claim that an email exchange cannot constitute a contract because of the writing requirement for forming a mineral lease. We are not so sure. While we are convinced that a mineral lease contract has some type of writing requirement, this requirement's source and scope, and whether an email exchange suffices to satisfy it, remain to us unclear. Compare *Hayes v. Muller*, 245 La. 356, 365 (La. 1963) (deriving a writing requirement from the principles of the Civil Code, now codified in the Mineral Code, La. R.S. 31:16, 18, that "the mineral lease" is an "incorporeal immovable" and "subject to the laws of registry," and by reference to articles, such as La. Civ. Code article 2440, governing the sale, rather than the lease, of immovables); *Louisiana ex rel. Ieyoub through Wildlife and Fisheries Com'n v. Justiss Oil Co., Inc.*, 665 So.2d 68, 70 (La.App. 1 Cir 1995) (referencing the "jurisprudential requirement that mineral leases be in writing" without citing any specific provisions of the Civil or Mineral Codes); *St. Romain v. Midas Exploration, Inc.*, 430 So.2d 1354, 1357 (La.App. 3 Cir. 1983) ("Although it is necessary that mineral leases be in writing, it is not essential that the lessee sign the written instrument."); *Bills v. Fruge*, 360 So.2d 661, 663 (La.App. 3 Cir. 1978) (holding that "mineral leases must be in writing" but determining whether a bank draft constituted "a valid written mineral lease," by reference to Civil Code Article 2670, governing an ordinary "Contract to lease," and asking whether the document evinced the parties' consent or intent to be bound, not whether it complied with any specific form requirements for the formation of a mineral lease).

Regardless, we do not need to decide that issue, for we are confident that even if an email exchange could constitute a valid mineral lease, it would have to, among other requirements, (i) evince offer and acceptance, and (ii) not show that the parties had contemplated consummating the deal by other means. The present exchange fails both of these requirements. Therefore, we find as a matter of law that it did not result in the formation of a contract.

**A. The alleged offer lacks acceptance**

Plaintiff claims that Broussard's email "confirm[ing] XTO's offer" constituted an offer, and Durr's response an acceptance. It is interesting to contemplate the legal effect had Durr indeed responded in a way that accepted Broussard's alleged offer. Broussard did not inform Plaintiff of XTO's suspensive condition, its reservation of "approval on lease packages greater than 3 million dollars," until after Durr had responded, and an offer cannot be altered or rescinded post-acceptance. La. Civ. Code arts. 1930, 1937. However, we find that Durr did not respond with an acceptance, so the question here is moot.

*1. Legal standard*

"A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals." La. R.S. 31:114. This definition "is intended to be consistent with the concepts embodied in Articles 2669 and 2670 of the Civil Code." *Id.* (cmt). "Louisiana mineral leases are construed as leases generally, and, whenever pertinent, the codal provisions applicable to ordinary leases are applied to mineral leases." *St. Romain*, 430 So.2d at 1356 (citing *Williams v. Humble Oil & Refining Co.*, 432 F.2d 772 [5th Cir. 1970]). Although the lease articles in neither the Mineral nor Civil Codes provide special provisions relating to the consent of the contracting parties, Article 2669 of the Civil Code applies the titles of "Obligations in General" and "Conventional Obligations or

Contracts" to leases. See *St. Romain*, 430 So.2d at 1356.

"A party who demands performance of an obligation must prove the existence of the obligation." La. Civ. Code art. 1831. "A contract is formed by the consent of the parties established through offer and acceptance." La. Civ. Code art. 1927. "A medium or a manner of acceptance is reasonable if it is the one used in making the offer or one customary in similar transactions at the time and place the offer is received, unless other circumstances known to the offeree indicate otherwise." La. Civ. Code art. 1936. "Before either party is obligated it is necessary that consent to the contract . . . be communicated to the other party." *St. Romain*, 430 So.2d at 1356.

"Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation." La. Civ. Code art. 1759. "The consent of the parties as to the thing and the rent is essential but not necessarily sufficient for a contract of lease." La. Civ. Code art. 2668. "An acceptance not in accordance with the terms of the offer is deemed to be a counteroffer." La. Civ. Code art. 1943.

*2. Application*

Here, as stated above, Plaintiff's representative Durr[1] replied to XTO's alleged offer in pertinent part as follows:

> We are all pleased to be moving forward with XTO.
>
> I know you are traveling but it would be great if you could send your form commitment letter. We would be happy to fill in the blanks for you. That way, once the addendum is approved by XTO, and we get any last minute questions answered,

---

[1] As the point was not contested in the parties' briefs, for the purpose of the present motion we assume without deciding that the agency relationship between Durr and Plaintiff was such to bind Defendants directly to Plaintiff had a contract between Durr and Defendants' representative been formed. Likewise, the authority for Broussard to negotiate appears to be no where questioned, and the parties have not briefed whether Broussard's alleged acceptance could bind XTO *at all*. Given this ruling, this is an issue we need not decide.

we can sign and return to you for XTO's counter signature.

(Doc. 31-3, p. 2; quoted in full *supra*). There is nothing in that statement constituting an acceptance. It is likewise not a counteroffer; rather, it is, as it says, an acknowledgment that the parties are "moving forward." It memorializes that the parties have agreed on certain key terms and will continue to negotiate on others, and at the conclusion of those negotiations will execute an agreement through a separate, signed document. It does not even hint that negotiations are concluded, as it leaves open both the need for approval of the addendum by XTO and the reality that "last minute questions" likely remained unanswered. It thus plainly contemplates that negotiations can still break down over those questions, and that the parties will not have executed a binding contract until they have answered all of those questions and executed a separate, signed agreement.

Accordingly, as Defendants' alleged offer was as a matter of law never accepted by Plaintiff or his representative, we find that no contract was created between the parties.

**B. The parties specifically understood that any provisional agreement(s) would not be binding until the final lease was consummated and relevant documents executed**

*1. Legal standard*

"When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form." La. Civ. Code art. 1947. "A contract to enter into a lease at a future time is enforceable . . . unless the parties understood that the contract would not be binding until reduced to writing or until its other terms were agreed upon." La. Civ. Code art. 2670.

*2. Application*

As stated, we are uncertain if an email exchange would be sufficient to form either a lease

or a contract to lease. In this case, however, we find that the parties understood they would execute additional documents before they would have formed a binding contract. As negotiations terminated before this step was taken, we find that no contract came into existence for this reason as well.

In particular, Defendants' alleged offer only came in reply to an email request from Durr, who wrote to Broussard to confirm the pool's understanding of certain lease terms being discussed. Durr did not request an offer, nor did he indicate that any reply to his mail would constitute an offer. Instead and to the contrary, he specifically stated that:

> If these terms are acceptable, we as a group accept your offer and would like to proceed immediately with finalizing a Commitment Letter, to be immediately followed by finalizing lease documents.

(Doc. 31-3, p. 3; quoted in full *supra*). The operative words in this communication are "if these terms are acceptable." This clause must be understood to have conveyed a suspensive condition to acceptance, in other words, a counteroffer. Meanwhile, nothing in the Record reflects that those "terms" - either as stated here, or as confirmed in the reply email from Broussard - were ever accepted by XTO. In addition, this response indicates that the alleged "offer" was prompted by a request that specifically stated that it would be followed - and the lease finalized - "by finalizing lease documents." *Id.* In these circumstances and absent other indicia of the parties' consent or intent to be bound by this exchange, it can only be concluded that the parties agreed and understood no lease agreement would be binding until these additional terms were agreed to and documents were executed. La. Civ. Code art. 2670.

Accordingly, for this and the other reasons given above, we find that no contract was created between the parties, and Plaintiff has no claim against Defendants for any contractual breach.

## II. PLAINTIFF PRESENTS NO EVIDENCE CONSTITUTING A CLAIM FOR PROMISSORY ESTOPPEL

Plaintiff also claims that he is entitled to recover in promissory estoppel,[2] and / or for his reasonable and detrimental reliance on Defendant's representations.[3] Specifically, he claims, with ample evidence and plausibility, that he rejected other offers to lease his land in reliance on Defendant's representations and thereby suffered major financial harm when Defendant unilaterally withdrew from the negotiations after these other offers had evaporated.

We sympathize with Plaintiff's plight. However, as discussed by the parties, a claim under this theory only lies if Plaintiff's reliance on Defendants' promises or representations was reasonable. Here, Plaintiff's reliance was unreasonable. Given the language of the parties' email communications, Plaintiff reasonably knew or should have known that Defendant would not be bound until the additional proposed terms were acknowledged and a written contract was consummated. So, these exchanges cannot constitute a basis for recovery under this theory.

Finally, there is direct evidence, submitted by Plaintiff, indicating that the members of the pool had been informed Defendants would not be, or at least would consider themselves not to be, legally bound until the members of the pool had signed their lease(s). (Doc. 35-1, p. 12).[4]

---

[2] This theory is relatively disfavored under Louisiana law because it developed in Common Law jurisdictions as a substitute for consideration, to make gratuitous promises binding despite their lack of consideration. Whereas Louisiana does not have a consideration requirement and has a separate regime of (binding) gratuitous obligations, this theory is generally unneeded except in certain specific circumstances not present here.

[3] Promissory estoppel and detrimental reliance are distinct theories of quasi-contractual recovery. However, as they both require the element of reasonable reliance on which Plaintiff's claim here falters, we address them jointly below.

[4] This information is contained in an email Burr sent to the other members of the pool documenting "what [he] learned" from a "chat with Brent Broussard [that] morning." (Doc. 35-1, p. 11). Obviously, if Plaintiff were to attempt to introduce this evidence at trial there would be questions of authenticity, accuracy, and hearsay. Here, we assume its accuracy and admissibility for summary judgment purposes,

Defendants may have provided other information intended to assuage Plaintiff's doubt, including that they were "reputable and would not walk away from a commitment for any reasons other than title." *Id.* However, Defendants also clearly communicated that they would not consider themselves legally bound until a written lease was executed. In this context, if Plaintiff had wanted a firmer commitment he should have insisted on it. Otherwise, despite Plaintiff's loss, we cannot conclude it was reasonable for him to refrain from entertaining other offers in reliance on Defendant's assurances, or that the law of quasi-contract provides him a remedy.[5]

## III. PLAINTIFF PRESENTS NO EVIDENCE SUPPORTING A CLAIM FOR FRAUD

Finally, even accepting Plaintiff's description of the parties' interactions, (Doc. 25, pp. 6-8), Defendants' conduct does not constitute fraud. Even were a contract here formed, simply welching on a contract is not fraud, nor is an inaccurate prediction by an agent about a principal's intentions when the inaccuracy was not known to the agent at the time the prediction was made. To prevail here, Plaintiff would have to show that Defendants made their representations with the intent to deceive, or at least with some mental element showing awareness of and indifference to their falsity. Even accepting arguendo that the statements were misrepresentations, Plaintiff points to no evidence of such intent or mental element, and we found none in our own review of the Record. Accordingly,

---

and anyway we consider it evidence of Plaintiff's understanding of Defendants' representations, whether they originated from Defendants or not.

[5] We note some confusion regarding commitment letters, whereby Defendants claim that such a letter would not have bound them but would have "committed" the pool members. This is obviously not how contract law works; unless framed as an irrevocable offer, such a letter would either bind both parties or neither. Anyway, if Defendants had induced Plaintiff to take detrimental steps to secure such a letter, such conduct could have formed the basis for a claim for reliance damages. However, as the parties' dickering never reached this stage, Plaintiff's hints at this theory of recovery are for naught and such a claim here does not lie. Finally, it is at least noteworthy, though not dispositive, that neither Durr nor any other member of the pool joined in this action

we likewise find that Defendants are entitled to judgment on this claim as a matter of law.

CONCLUSION

For the reasons given above, we find that Plaintiff has no legal basis for his claims of breach of contract, promissory estoppel, or fraud. Accordingly, in a separate order also rendered this date, we ORDER that Defendants' motion for summary judgment (Doc. 31) be GRANTED and Plaintiff's claims be DISMISSED with prejudice.

SIGNED on this 24th day of March, 2011 at Alexandria, Louisiana

DEE D. DRELL
UNITED STATES DISTRICT JUDGE